793 So.2d 1094 (2001)
Kalliope VITAKIS-VALCHINE, Appellant,
v.
David L. VALCHINE, Appellee.
No. 4D00-2013.
District Court of Appeal of Florida, Fourth District.
August 22, 2001.
*1095 Lynn G. Waxman of Lynn G. Waxman, P.A., West Palm Beach, and Steven L. Berzner of Steven L. Berzner, P.A., Fort Lauderdale, for appellant.
William F. Murphy, III, of Murphy & O'Brien, Miami, for appellee.
STEVENSON, J.
This is an appeal from a final judgment of dissolution which was entered pursuant to a mediated settlement agreement. The wife argues that the trial court erred in affirming the recommendations of the general master and in denying her request to set aside the settlement agreement on the grounds that it was entered into under duress and coercion. We affirm the order to the extent that the trial court concluded that the wife failed to meet her burden of establishing that the marital settlement agreement was reached by duress or coercion on the part of the husband and the husband's attorney. The wife also alleges that the mediator committed misconduct during the mediation session, including but not limited to coercion and improper influence, and that she entered into the settlement agreement as a direct result of this misconduct. For the reasons which follow, we hold that mediator misconduct can be the basis for a trial court refusing to enforce a settlement agreement reached at court-ordered mediation. Because neither the general master nor the trial court made any findings relative to the truth of the allegations of the mediator's alleged misconduct, we remand this case for further findings.

*1096 Procedural background

By August of 1999, Kalliope and David Valchine's divorce proceedings to end their near twelve-year marriage had been going on for one and a half to two years. On August 17, 1999, the couple attended court-ordered mediation to attempt to resolve their dispute. At the mediation, both parties were represented by counsel. The mediation lasted seven to eight hours and resulted in a twenty-three page marital settlement agreement. The agreement was comprehensive and dealt with alimony, bank accounts, both parties' IRAs, and the husband's federal customs, postal, and military pensions. The agreement also addressed the disposition of embryos that the couple had frozen during in vitro fertilization attempts prior to the divorce. The agreement provided in this regard that "[t]he Wife has expressed her desire to have the frozen embryos, but has reluctantly agreed to provide them to the husband to dispose of."
A month later, the wife filed a pro se motion seeking to set aside the mediated settlement agreement, but by the time of the hearing, she was represented by new counsel. The wife's counsel argued two grounds for setting aside the agreement: (1) coercion and duress on the part of the husband, the husband's attorney and the mediator; and (2) the agreement was unfair and unreasonable on its face. The trial court accepted the general master's findings which rejected the wife's claim on both grounds. On appeal, the wife attacks only the trial court's refusal to set aside the couple's settlement agreement on the ground that it was reached through duress and coercion.

Third party coercion
As a general rule under Florida law, a contract or settlement may not be set aside on the basis of duress or coercion unless the improper influence emanated from one of the contracting partiesthe actions of a third party will not suffice. See Cronacher v. Cronacher, 508 So.2d 1270, 1271 (Fla. 3d DCA 1987); Bubenik v. Bubenik, 392 So.2d 943, 944 (Fla. 3d DCA 1980); see also Herald v. Hardin, 95 Fla. 889, 116 So. 863 (1928). In this case, the record adequately supports the finding that neither the husband nor the husband's attorney was involved in any duress or coercion and had no knowledge of any improper conduct on the part of the mediator.
Because there was no authority at the time holding that mediator misconduct, including the exertion of duress or coercion, could serve as a basis for overturning the agreement, the general master made no findings relative to the wife's allegations. The mediator's testimony was presented prior to that of the wife, and, consequently, her allegations of potential misconduct were not directly confronted. Here, we must decide whether the wife's claim that the mediator committed misconduct by improperly influencing her and coercing her to enter into the settlement agreement can be an exception to the general rule that coercion and duress by a third party will not suffice to invalidate an agreement between the principals.

The former wife's claims
The wife testified that the eight-hour mediation, with Mark London as the mediator, began at approximately 10:45 a.m., that both her attorney and her brother attended, and that her husband was there with his counsel. Everyone initially gathered together, the mediator explained the process, and then the wife, her attorney and her brother were left in one room while the husband and his attorney went to another. The mediator then went back and forth between the two rooms during the course of the negotiations in what the mediator described as "Kissinger-style shuttle diplomacy."
*1097 With respect to the frozen embryos, which were in the custody of the Fertility Institute of Boca Raton, the wife explained that there were lengthy discussions concerning what was to become of them. The wife was concerned about destroying the embryos and wanted to retain them herself. The wife testified that the mediator told her that the embryos were not "lives in being" and that the court would not require the husband to pay child support if she were impregnated with the embryos after the divorce. According to the wife, the mediator told her that the judge would never give her custody of the embryos, but would order them destroyed. The wife said that at one point during the discussion of the frozen embryo issue, the mediator came in, threw the papers on the table, and declared "that's it, I give up." Then, according to the wife, the mediator told her that if no agreement was reached, he (the mediator) would report to the trial judge that the settlement failed because of her. Additionally, the wife testified that the mediator told her that if she signed the agreement at the mediation, she could still protest any provisions she didn't agree with at the final hearingincluding her objection to the husband "disposing" of the frozen embryos.
With respect to the distribution of assets, the wife alleges that the mediator told her that she was not entitled to any of the husband's federal pensions. She further testified that the mediator told her that the husband's pensions were only worth about $200 per month and that she would spend at least $70,000 in court litigating entitlement to this relatively modest sum. The wife states that the mediation was conducted with neither her nor the mediator knowing the present value of the husband's pensions or the marital estate itself. The wife testified that she and her new attorney had since constructed a list of assets and liabilities, and that she was shortchanged by approximately $34,000 not including the husband's pensions. When asked what she would have done if Mr. London had told her that the attorney's fees could have amounted to as little as $15,000, the wife stated, "I would have took [sic] it to trial."
Finally, the wife testified that she signed the agreement in part due to "time pressure" being placed on her by the mediator. She testified that while the final draft was being typed up, the mediator got a call and she heard him say "have a bottle of wine and a glass of drink, and a strong drink ready for me." The wife explained that the mediator had repeatedly stated that his daughter was leaving for law school, and finally said that "you guys have five minutes to hurry up and get out of here because that family is more important to me." The wife testified that she ultimately signed the agreement because
[I] felt pressured. I felt that I had no other alternative but to accept the Agreement from the things that I was told by Mr. London. I believed everything that he said.

Court-ordered mediation
Mediation is a process whereby a neutral third party, the mediator, assists the principals of a dispute in reaching a complete or partial voluntary resolution of their issues of conflict. See § 44.1011, Fla. Stat. (2000). Mandatory, court-ordered mediation was officially sanctioned by the Florida legislature in 1987, and since then, mediation has become institutionalized within Florida's court system. See Ch. 44, Fla. Stat. (2000).[1] All twenty judicial circuits *1098 in Florida utilize some form of court-connected mediation to assist with their caseloads.[2] The process is meant to be non-adversarial and informal, with the mediator essentially serving as a facilitator for communications between the parties and providing assistance in the identification of issues and the exploration of options to resolve the dispute. Ultimate authority to settle remains with the parties. See § 44.1011(2), Fla. Stat. Mediation, as a method of alternative dispute resolution, potentially saves both the parties and the judicial system time and money while leaving the power to structure the terms of any resolution of the dispute in the hands of the parties themselves.
Mediation, pursuant to chapter 44, is mandatory when ordered by the court. Any court in which a civil action, including a family matter, is pending may refer the case to mediation, with or without the parties' consent. See § 44.102(2), Fla. Stat. (2000). Communications during the mediation sessions are privileged and confidential. See § 44.102(3)-(4), Fla. Stat. During court-ordered mediation conducted pursuant to the statute, the mediator enjoys "judicial immunity in the same manner and to the same extent as a judge." § 44.107, Fla. Stat. The mediation must be conducted in accordance with rules of practice and procedure adopted by the Florida Supreme Court. See § 44.102(1).
Comprehensive procedures for conducting the mediation session and minium standards for qualification, training, certification, professional conduct, and discipline of mediators have been set forth by the Florida Supreme Court in the Florida Rules for Certified and Court Appointed Mediators, Rule 10. Predecessors to these rules initially took effect in 1987 and were amended in February 2000. See In re Amendments to the Fla. Rules for Certified & Court-Appointed Mediators, 762 So.2d 441 (Fla.2000). One of the hallmarks of the process of mediation is the empowerment of the parties to resolve their dispute on their own, agreed-upon terms. While parties are required to attend mediation, no party is required to settle at mediation.
(a) Decision-making. Decisions made during a mediation are to be made by the parties. A mediator shall not make substantive decisions for any party. A mediator is responsible for assisting the parties in reaching informed and voluntary decisions while protecting their right of self-determination.
Fla. R. Med. 10.310(a). The committee notes to the rule provide in part that
While mediation techniques and practice styles may vary from mediator to mediator and mediation to mediation, a line is crossed and ethical standards are violated when any conduct of the mediator serves to compromise the parties' basic right to agree or not to agree. Special care should be taken to preserve the party's right to self-determination if the mediator provides input to the mediation process.
In keeping with the notion of self-determination and voluntary resolution of the dispute at court-ordered mediation, any improper influence such as coercion or duress on the part of the mediator is expressly prohibited:

*1099 (b) Coercion Prohibited. A mediator shall not coerce or improperly influence any party to make a decision or unwillingly participate in a mediation.
Fla. R. Med. 10.310(b). Likewise, a mediator may not intentionally misrepresent any material fact in an effort to promote or encourage an agreement:
(c) Misrepresentation Prohibited. A mediator shall not intentionally or knowingly misrepresent any material fact or circumstance in the course of conducting a mediation.
Fla. R. Med. 10.310(c).
Other sections of Rule 10 address the rendering of personal or professional opinions by the mediator, and one section specifically provides that
A mediator shall not offer a personal or professional opinion as to how the court in which the case has been filed will resolve the dispute.
Fla. R. Med. 10.370(c). Under this section, the committee notes caution that
While mediators may call upon their own qualifications and experience to supply information and options, the parties must be given the opportunity to freely decide upon any agreement. Mediators shall not utilize their opinions to decide any aspect of the dispute or to coerce the parties or their representatives to accept any resolution option.
The question we are confronted with in this case is whether a referring court may set aside an agreement reached in court-ordered mediation if the court finds that the agreement was reached as a direct result of the mediator's substantial violation of the rules of conduct for mediators. We believe that it would be unconscionable for a court to enforce a settlement agreement reached through coercion or any other improper tactics utilized by a court-appointed mediator.[3] When a court refers a case to mediation, the mediation must be conducted according to the practices and procedures outlined in the applicable statutes and rules. If the required practices and procedures are not substantially complied with, no party to the mediation can rightfully claim the benefits of an agreement reached in such a way. During a court-ordered mediation, the mediator is no ordinary third party, but is, for all intent and purposes, an agent of the court carrying out an official court-ordered function. We hold that the court may invoke its inherent power to maintain the integrity of the judicial system and its processes by invalidating a court-ordered mediation settlement agreement obtained through violation and abuse of the judicially-prescribed mediation procedures.
"Every court has inherent power to do all things that are reasonably necessary for the administration of justice within the scope of its jurisdiction, subject to valid existing laws and constitutional provisions." Rose v. Palm Beach County, 361 So.2d 135, 137 (Fla.1978). In a variety of contexts, it has been held that the courts have the inherent power to protect the integrity of the judicial process from perversion and abuse. See Attwood v. Singletary, 661 So.2d 1216 (Fla.1995)(invoking court's inherent authority to prevent "abusive filer" from filing additional cases and, thus, interfering with orderly process of judicial administration); Tramel v. Bass, 672 So.2d 78 (Fla. 1st DCA 1996)(invoking court's inherent authority to strike pleadings *1100 to sanction fraud perpetrated on the court). While the doctrine of inherent power should be invoked "cautiously" and "only in situations of clear necessity," we have little trouble deciding that the instant case presents a compelling occasion for its use. See Rose, 361 So.2d at 138.
We hasten to add that no findings were made as to whether the mediator actually committed the alleged misconduct. Nevertheless, at least some of the wife's claims clearly are sufficient to allege a violation of the applicable rules. On remand, the trial court must determine whether the mediator substantially violated the Rules for Mediators, and whether that misconduct led to the settlement agreement in this case.
AFFIRMED in part, REVERSED in part, and REMANDED.
GUNTHER and SHAHOOD, JJ., concur.
NOTES
[1] For an excellent perspective on the development of mediation within the courts of Florida, see Sharon Press, Institutionalization: Savior or Saboteur of Mediation?, 24 FLA. ST. U.L.REV. 903 (1997), and articles cited therein.
[2] See Press, supra note 1. Additionally, at the present time, the First District Court of Appeal has two court-annexed mediators on staff. The Fifth District Court of Appeal is currently engaged in a pilot project involving private mediators doing appellate mediation. This court presently has two appellate mediators on staff, but because of budgetary and other considerations, the Fourth District's appellate mediation program will be discontinued as of September 30, 2001.
[3] Most mediation is conducted by private mediators who are appointed by the court and paid by the parties. A few jurisdictions have mediators on staff who may be paid by the court or the parties, depending on the financial circumstances of the participants. In either event, "[a] mediator is accountable to the referring court with ultimate authority over the case." Fla. R. Med. 10.500.